**In re A.J. TRAVISANO, INC., t/a Philip a/k/a Philip, Inc., Debtor.**

Bankruptcy No. 84–00410T.

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 29, 1987.

Alfred P. Antonelli, James P. Fiorentino, Bethlehem, Pa., for objector.

James G. Watt, Allentown, Pa., trustee.

David J. Jordon, Charles J. Hair, Allentown, Pa., for debtor and trustee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The tortured procedural history and piecemeal record developed in this case make the decision of the question before us a difficult one. Arising in the context of an Objection to the sale of a liquor license by the Trustee in this Chapter 7 case is the question of what the ownership rights in the license are as between the "lessor" (or "seller") and the Debtor, a corporate "lessee" (or "purchaser") of the license. Be-

cause we believe that a prior Order of this Court, per Chief Judge Thomas M. Twardowski, on May 14, 1985, establishes that the Objector has peculiar equities in his favor, we are constrained to distinguish this case from the several decisions which have totally protected the property rights of purchasers of liquor licenses from their vendors. We therefore enter an Order refusing to allow the Trustee to transfer the liquor license to any third party, but requiring the Objector to pay to the Trustee the sum of $5,000.00 to clear his title in the license.[1]

On June 1, 1983, the Objector, ANTHONY J. TRAVISANO (hereinafter "the Objector"), and his wife, EVELYN A. TRAVISANO, entered into a contract to transfer a restaurant and bar located at 750 Main Street, Rear, Hellertown, Pennsylvania, along with the establishment's Pennsylvania Liquor License No. R–19562, to a corporation named on the contract as "A.J. TRAVISANO, INC., t/a PHILIP." Designated as a "lease Agreement," the document required the corporate "lessee" to pay $5,000.00 on the date of the signing of the document; and $14,400.00 annually at $1,200.00 monthly for five (5) years. The contract also included the following among its additional terms: (1) An agreement of sale of the common stock of the corporation, with stock powers to be given to the transferor as security; (2) An option to the "lessee" to purchase the entire bar and restaurant and the liquor license at any time during the five-year lease period for $200,000.00, with all payments on the "lease" to be credited towards the purchase price.

One of the difficulties in piecing together the facts is that the record was made in two (2) brief hearings in connection with a

Motion for relief from the stay conducted over two (2) years ago. The first hearing, on June 12, 1984, was attended only by the Objector and his counsel. At the second hearing, on October 17, 1984, testimony was adduced only from Gordon Brader and Kathleen Fischer, two (2) of the group of "purchasers." [2]

The Objector had operated the bar and restaurant establishment, as the sole stockholder of the corporation bearing his name, for seven (7) years prior to the transaction in issue, at which time it was known as "the Where House." (Notes of Testimony, June 12, 1984 (hereinafter "6/84T."), at 14). The Objector testified that he entered into the contract of June 1, 1983, with a group of "purchasers" including Philip M. Malozi, his wife, Louan C. Malozi, Mr. Brader, Ms. Fischer, John Ley, Harry Singley, and Anthony Trunzo. (*Id.* at 14–15).

Mr. Brader testified that, by September or October, 1983, the other members of the group of "purchasers" had bought out the interests of Mr. and Mrs. Malozi. (Notes of Testimony, Oct. 17, 1984 (hereinafter "10/84 T."), at 10–11). Also, one Jan Billy apparently purchased the interests of Mr. Trunzo. (6/84T., at 20; 10/84T., at 10). Mr. Brader became President of the corporation after Mr. and Mrs. Malozi left the operation. (10/84 T., at 9).

Apparently, the "purchasers" made the initial $5,000.00 payment to the Objector, and thereafter made the $1,200.00 monthly payments through November, 1983. (6/84 T., at 15–16; 10/84 T., at 19). However, the "purchasers" never did sign the stock powers, and the stock was physically retained by the Objector as security. (6/84 T., at 16–18, 19–20, 22). Although certain steps were taken to do so, a transfer of

---

1. Since very few of the determinative factors here relate to factual findings, we do not feel that the format of Bankruptcy Rules 9014 and 7052 and Federal Rule of Civil Procedure 52 would be appropriate in setting forth our conclusions. Therefore, we are utilizing the narrative format.

2. It is very difficult to recreate the procedural history of this case and explain precisely how

this occurred. For example, it is unclear why the "purchasers" did not appear at the original hearing on June 12, 1984. As we note at page 596 *infra*, in our Order of November 4, 1986, we gave all parties full opportunity to present further evidence to fill out the record if they wished to do so. They declined to do so. We must therefore do our best with what is available to us in the way of a record.

ownership of the liquor license was never effected. (*Id.* at 16–17).[3]

In October, 1983, there were negotiations between the Objector and the realigned group of "purchasers" to prepare a new lease that would change the names of the parties and the date of payment to the 15th of the month instead of the first, and that would reduce the period of the lease to three (3) years. (10/84 T., at 11–15). However, certain portions of this document were the subject of objection by the "purchasers," and no other document was ever executed to amend the June 1, 1983, "lease." (*Id.*).

On or about December 10, 1983, the "purchasers" ceased operation of the business, because, per Mr. Brader, "[i]t just wasn't making any money, and problems." (10/84 T., at 19). The Objector testified that, before he went on a vacation trip in mid-December, 1983, Mr. Brader asked him to take the business back over when he returned. (6/84 T., at 23). The Objector testified that, when he returned from vacation sometime after December 10, 1983, the business had already been locked up and, as he put it, abandoned. (*Id.* at 16, 17, 23). Mr. Brader testified that the Objector changed the locks, but there is no indication that he did so without at least the tacit permission of the "purchasers." (10/84 T., at 20). The Objector, at some indeterminate time thereafter, confessed judgment for the rents due under the lease in state court against, presumably, the corporation. (6/84 T., at 18).

On February 7, 1984, the purchasers filed the instant bankruptcy case under Chapter 7 of Title 11, U.S. Code., on behalf of the corporation. (6/84 T., at 23). On or about May 1, 1984, the Objector filed a Motion for Relief from the Automatic Stay in order to allow him to retake the business. At the close of the hearing on June 12, 1984, the court entered an "interim Order" granting this relief. (*Id.* at 26).

On May 14, 1985, the court entered a Final Order on this Motion. Therein, the Court decreed that the lease agreement terminated sixty (60) days after the Order for Relief by effect of 11 U.S.C. § 365(d)(1),[4] that "the estate's interest, if any, in the property subject to the lease agreement terminated after 60 days," and that the automatic stay was modified "to permit the movants [the Objector and his wife] to pursue any and all rights which they may have under Pennsylvania law with regard to said license."

The Objector had, apparently, on the basis of the interim Order of June 12, 1984, already re-taken possession of the business and transferred the liquor license into his name by this time on the strength of the "interim order" of June 12, 1984. However, instead of pursuing any action in state court to obtain a declaration of his rights in the liquor license, as Judge Twardowski seems to have contemplated, the Objector, on or about November 15, 1985, filed an Application to attempt to "withdraw" this entire case, apparently on the basis that the purchasers lacked the corporate authority to file same on behalf of the corporation. However, on June 25, 1986, this Court, per Judge Twardowski, denied this Application, stating that the Court perceived the Application to be a motion pur-

---

**3.** While these "facts" are ascertained solely from the testimony of the Objector, Mr. Brader provided no direct testimony to the contrary when he appeared to testify several months later. Mr. Brader testified only that he "thought" that necessary information to effect the transfer of the liquor license had been supplied by other members of the group of "purchasers" and that he had signed the necessary papers (10/84 T., at 25–26), and that he had no idea as to what had occurred regarding the corporate documents. (*Id.* at 18–19).

**4.** This provision, as it existed prior to the Amendments effected by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (BAFJA), the form which applies to this proceeding, since it was filed prior to the effective date of BAFJA, read as follows:

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

suant to 11 U.S.C. § 707(a), and that the showing of cause required by that section had not been met.[5]

On August 12, 1986, the Trustee, James G. Watt, Esquire, filed an Application to Sell the Liquor License Free and Clear of Liens and Encumbrances, and for Distribution of Sale Proceeds. On August 28, 1986, the Objector filed the Objections to Sale which are presently before us for disposition. It should be noted that, in the Application, the Trustee states that, by Notice of July 30, 1985, he proposed to sell the liquor license to the Objector for $5,000.00, and that, thereafter, a third party offered to buy the license for $15,000.00. His proposal to take advantage of this higher offer sparked the new Application and the filing of the Objections before us.

This matter came before the undersigned on October 24, 1986, while sitting in our Reading station during the temporary disability of Chief Judge Twardowski. At a conference among counsel for the Objector, counsel for the Trustee (who we note had been and presumably still is the counsel for the Debtors and who filed this bankruptcy case on their behalf), and the Trustee himself, the parties both contended that, in different ways, the prior Orders of Judge Twardowski resolved the matter in their favor, the Objector urging that the May 14, 1985, Order was decisive in his favor, and the Trustee arguing equally as vociferously that the Order of June 25, 1986, was decisive in his favor. After discussing the matter with Judge Twardowski, we concluded that neither Order was decisive, and a hearing was scheduled on December 12, 1986, at which the parties were invited to present testimony to supplement that presented in the 1984 hearings, which would be considered as part of the record, and/or oral argument relevant to the Application to sell and Objections thereto. We

did require that the parties identify any witnesses that they would call on December 12, 1986, or submit Briefs if they desired to present no additional evidence, on or before November 28, 1986.

Both parties opted not to present any further testimony, but did submit Briefs, and presented oral argument on December 12, 1986. At that argument, the Court pointed out to the parties that numerous bankruptcy court decisions involving rights in Pennsylvania liquor licenses had been rendered, and that neither party had discussed any of these or the impact of them in their Briefs. These included *In re Kluchman*, 59 B.R. 13 (Bankr. W.D.Pa. 1985) (per COSETTI, J.); *In re M.J.'s, Inc.*, 49 B.R. 492 (Bankr. W.D.Pa.1985) (per WASHABAUGH, J.); *In re Hodges*, 33 B.R. 51 (Bankr. E.D.Pa.1983) (per TWARDOWSKI, J.); *In re Stubenhofer*, 31 B.R. 820 (Bankr. W.D.Pa.1983) (per WASHABAUGH, J.); *In re Lorimal, Inc.*, 23 B.R. 457 (Bankr. E.D. Pa.1982) (per KING, J.); and *In re Branding Iron, Inc*, 7 B.R. 729 (Bankr. E.D.Pa. 1980) (per KING, J.).

At the close of the argument, we entered an Order that day requiring both parties to submit supplemental Briefs discussing these cases and a more recent unreported decision of Judge King in *In re Kramer, Johnson v. Kramer*, 71 B.R. 2 (Bankr. E.D.Pa.1986), a copy of which we attached to our Order, on or before December 26, 1986. After brief extensions, these Supplemental Briefs were prepared and received by us in early January, 1987.

After reviewing these decisions in light of the parties' Supplemental Briefs, we are struck with the unusual and perhaps unique nature of the instant factual setting, which causes us to enter an Order which we believe is uniquely appropriate to

---

5. Actually, 11 U.S.C. § 707, in the form that it existed at the pertinent time prior to enactment of BAFJA, had no subsections and read as follows:

The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors; and
(2) nonpayment of any fees and charges required under chapter 123 of title 28.

a just resolution of the present controversy.

The earlier bankruptcy court decisions, *Branding Iron* and *Lorimal*, allowed security interests of creditors who were not involved in sales of the licenses in issue to the respective debtors to attach to liquor licenses. However, thereafter, on April 18, 1984, the Pennsylvania Supreme Court issued a decision in *1412 Spruce, Inc. v. Commonwealth Liquor Control Bd.*, 504 Pa. 394, 474 A.2d 280 (1984), in which it held that, in Pennsylvania, a liquor license is not property subject to execution. In *M.J.'s, supra,* and *Stubenhofer, supra,* Judge Washabaugh accepted the intevening decision in *1412 Spruce* as authority for the conclusion that *Branding Iron* and *Lorimal* were overruled. However, in *Kluchman,* Judge Cosetti issued an Opinion which rejects the notion that the impact of *1412 Spruce* was so extensive, and holds, contrary to the decisions of Judge Washabaugh, that a secured creditor could and, in that case, did have a validly perfected security interest in a liquor license.

The *Hodges* and *Kramer* cases address a somewhat different problem: claims by conditional vendors in agreements of sale of liquor licenses to recover the licenses from debtor-conditional vendees. In both cases, the courts rejected the vendors' claims that defaults in the sale agreements, which gave the vendors rather sweeping rights to terminate the conditional sale contracts and retake the licenses, could be enforced in actions commenced after relief from the respective bankruptcy's automatic stay. In both cases, the courts cited to *1412 Spruce* and its holding that liquor licenses were not items of property subject to execution as support for the conclusion that the vendors did not have security interests which would give them sufficient rights to obtain relief from the automatic stay and retake the licenses.

The relationship of the Objector to the Debtor here is obviously more akin to the relationship that existed between the moving parties and the debtors in *Hodges* and *Kramer* than that between the creditors and the debtors in the other cases. It is doubtful that Judge Cosetti or any judge would reach a decision contrary to *Hodges* and *Kramer* given the equities of those factual settings.

This observation appears to bode ill for the Objector here. However, we are forced to observe that the equities here are stronger for the Objector than they were for the vendors in *Hodges* and *Kramer.* The underlying agreement here is at least nominally a lease instead of a conditional sale. Further, Judge Twardowski, presumably with full knowledge of the precedent which he had established in *Hodges,* analyzes the contract here completely differently than he did the contract in *Hodges,* considering the contract here as an executory lease contract, and holds, at least in the context of a 362 motion, that the failure of the Trustee to assume the lease resulted, per 11 U.S.C. § 365(d)(1), in its automatic rejection.

We do not believe that too much significance can be attached to the mere form of the contract as a lease, as opposed to a conditional sale, because the purchasers could buy the entire business, including the liquor license, at a reduced price, which might be considered "nominal consideration." Such a transaction, at least in other commercial contexts, could hence be deemed to be a conditional sale, not a "true" lease. *See, e.g., Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 890–91 (S.D.Ohio 1983); *In re United Nesco Container Corp.,* 47 B.R. 230, 233 (Bankr. E.D. Pa.1985) (per KING, J.); and *Bonczek v. Pascoe Equipment Co.,* 304 Pa.Super. 11, 18–21, 450 A.2d 75, 78–80 (1982). However, it is clear to us that the equities are different here than in *Hodges* and *Kramer,* because the principals of the Debtor here relinquished possession and control of the business and the liquor license to the Objector, in what appears to have been a largely-voluntary transition, prior to the bankruptcy filing, and they have indicated no interest in returning to run the business. Further, the Objector apparently has, from the time of the court's interim

Order of June 12, 1984, through its confirmation of that Order in its Final Order of May 14, 1985, and apparently continuing to date, successfully operated the business. No such elements were present in *Hodges* and *Kramer*.

■ We therefore believe that it would be unjust to allow the Trustee to sell the liquor license in question to any third parties, as he proposes. On the other hand, the decisions cited hereinbefore cause us to hesitate to hold that the Objector should be awarded the liquor license without any payment on his part. Certainly, as Judge Twardowski suggested at the June 12, 1984, hearing, there is the potential of the Trustee's seeking to avoid preferential transfers to the Objector, not only in the transfer of the possessory interest of the business to the Objector within ninety (90) days of the filing, but the transfer of, apparently, over $10,000.00 in cash to the Objector, a potential "insider," within a year of the filing. *See* 11 U.S.C. § 547(b)(4)(A), (B).[6] Also, we note that, as of July 30, 1985, the Objector was willing to pay the Trustee the sum of $5,000.00 for the liquor license.

In attempting to do equity between the parties, we shall therefore order that the Trustee shall transfer the liquor license to the Objector, subject to the conditions set forth in the Notice of July 30, 1985, and upon the additional conditions that (1) the Objector shall be barred from any distribution from the proceeds of the estate; and (2) the Trustee and the Debtor shall be barred from making any claims to set aside any of the pre-petition payments made by the corporation to the Objector as preferential transfers. In this way, the Objector will recover his business with no further liabilities or strings attached, and a fund will be available to effect at least some distribution to the Debtor's creditors. In sum, we believe this to be a totally equitable resolution of the dispute at hand.

An Order so providing shall be entered.

---

**6.** *See* 11 U.S.C. § 101(30)(B). If the Objector is correct in his assertion that the stock was never properly transferred, it would certainly appear that he is an "insider," per this definition.